IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
|     Plaintiff, | ) | |
| | ) | No. 21 CR 392 |
| v. | ) | |
| | ) | Hon. Mary M. Rowland |
| JOSHUA WALKER, | ) | |
|     Defendant. | ) | |

### JOSHUA WALKER'S SENTENCING MEMORANDUM

    The earliest nomadic people are often misunderstood as being too transient to have developed "culture" because they infrequently produced written histories. Modern historians have reevaluated this misconception by looking more closely at the item these groups carried with them. For nomadic people, traditions and culture were woven into the artifacts they adorned themselves with, whether it be through cloth or jewelry; items that could be worn and easily transported from place to place.

    Although the world now sees fewer and fewer communal groups of nomadic people, many of our American institutions create nomads without their consent and without the traditional larger communities with which to travel. These new nomads have even less ability to carry with them the talismans of their personal histories. From foster care, to housing instability, to prison transfers, modern involuntary nomads often have less control over their personal possessions, and must record their histories physically on their skin. For Mr. Walker, whose living situation was often unstable, his skin serves as a place to record what he has lost, a memorial to those he has loved but who have passed. Over the last four years of custody, Mr. Walker hopes

1

to find a stability that has often eluded him, and to move away from a life that promises to keep him from that stability.

NOW COMES, Defendant, JOSHUA WALKER, by and through his attorney, QUINN A. MICHAELIS, and respectfully requests, pursuant to 18 U.S.C. § 3553(a), and *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, that this Honorable Court impose a sentence of 85 months (1 month for Count 2, and the mandatory 84 months for Count 3), because such sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a). In support of this request, Mr. Walker states as follows:

I. THE GUIDELINE CALCULATION

Mr. Walker agrees with the PSR's guideline calculation and criminal history calculation. As such, his advisory sentencing range is 33 to 41 months, plus an additional sentence of 7 years to be served consecutive to the sentence for Count 2.

II. A SENTENCE OF 85 MONTHS TOTAL WOULD BEST ACCOMPLISH THE GOALS OF 18 U.S.C. § 3553(a)

The Court must impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2), " which are "the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1)-(7).

### a. The need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

The need for retribution is measured by the degree of "blameworthiness," which" is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity."[1]

The sentencing statute requires that the sentence imposed must be no greater than necessary to serve the punitive purpose of sentencing. For several decades now, the response to this directive has been "the longer, the better." Incarceration rates in the United States are "now almost five times higher than the historical norm prevailing throughout most of the twentieth century, and they are three to five times higher than in other Western democracies."[2]

---

[1] Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 MINN. L. REV. 571, 590 (February 2005).
[2] Todd R. Clear & James Austin, *Reducing Mass Incarceration: Implications of the Iron Law of Prison Populations,* HARV. LAW & POLICY REV. 307 (Summer 2009) (footnotes and citations omitted).

The circumstances of Mr. Walker's offense do not exist in a vacuum, however. His offense is the culmination of years of untreated trauma, from the sudden disappearance of his mother at age six, his placement in foster care, and his significant learning disabilities. These events and circumstances left Mr. Walker particularly vulnerable to negative peer influences as he struggled to find a place where he belonged.

In one of the most comprehensive, long-term studies on the effects of childhood bereavement, researchers found that childhood bereavement was associated with a higher incidence of depression, post-traumatic stress disorder (PTSD), and functional impairment (meaning a psychological, cognitive, or physical impairment creating the inability to perform personal and instrumental activities of daily living and associated tasks necessitating some form of supervision, or assistance, or both).[3] This study found that losing a parent in childhood increased a child's risk of suffering from PTSD, and more significantly, that they suffered from functional impairment that was not diminished over time.[4] The study concluded that "erosion of familial social support, along with the impact of negative life events, contribute to enduring impairment."[5]

Here, although Mr. Walker did not lose his mother to death, she disappeared to imprisonment when Mr. Walker was just six years old. He did not learn where his mother was until he was much older and she was released from prison. For some

---

[3] Pham S., et. al., *The Burden of Bereavement: Early-Onset Depression and Impairment in Youths Bereaved by Sudden Parental Death in a 7-Year Prospective Study.* Am J Psychiatry, 2018 175 (9): 887-896
[4] *Id.* at 893
[5] *Id.* at 895

4

time, Mr. Walker's mother was simply gone with no explanation of what happened to her, and no contact with her to comfort Mr. Walker that she would return. He recalls of that time being home alone with his sister when a friend of his mother's collected the children and brought them to a police station. From there, Mr. Walker and his sister were placed in foster care. As the PSR notes, both Mr. Walker and his grandmother reported that while in foster care, Mr. Walker was most concerned over his sister's wellbeing and did not want to be separated from her. Once Mr. Walker moved to his grandparents" home, his sister went to live with her father, and they were separated, although Mr. Walker is still close with his sister.

Similarly, Mr. Walker's relationship with his father only increased his feelings of loneliness and abandonment. Mr. Walker never met his father, and his family did not talk about hi,. When he turned 18 years old, he asked his mother to reach out to his father, but Mr. Walker was told that his father did not want anything to do with him. This rejection further drove Mr. Walker's desire to fit in with his peers.

There no doubt that these circumstances had a lasting negative impact on his life. After Mr. Walker was taken in by his grandparents, his grandmother, Cyd Holifield, noted that Mr. Walker "bad off and would knock holes in the wall." (PSR at 88). Despite his behavioral struggles, Ms. Holifield became a tireless advocate for her grandson and worked to ensure that Mr. Walker received educational support and social security payments due to his significant learning disability.

Ms. Holifield described that, as a result of his learning disabilities, Mr. Walker "became a follower." (PSR at 94). This is supported in Mr. Walker's IEP, which states that Mr. Walker became easily distracted at school by friends, and "has immature

5

socialization and problem solving skills. When he becomes upset and frustrated and intolerant of others, he exhibits attention getting behaviors because he desires acceptance from his peers." (Exhibit IEP, p 23.)

Mr. Walker's difficult relationships with his friends are also echoed in Government's Exhibit 10, page 25. As Mr. Walker struggles to answer the detective's questions, Mr. Walker states "I tell him [speaking of Abston] I was like, where we going? He was like, I'm finna go hit some licks. I say, nah, take me home, bro, and he was like, I need you drive for me. I said bro, I'm already on paper so I don't do this bro, this is not me, bro, for real. He was like bro, I hate you bro. Then I was like, bro."

In addition to his struggle with being accepted, Mr. Walker experienced the trauma from multiple losses of both friends and family members. It is no secret that Chicago suffers from an epidemic of gun violence. News media paints a grim picture, making Chicago appear to outsiders as one of the most dangerous cities in the country. The gun violence in Chicago is so extreme in some neighborhoods that the city has earned the nickname "Chiraq" for its similarity to a warzone. In fact, social science research has shown that children who grow up surrounded by gun violence exhibit the same psychological traumas as children who grow up in war zones.[6] And the COVID

---

[6] Garbarino, J., Kostelny, K., & Dubrow, N. (1991). *What children can tell us about living in danger*. American Psychologist, 46(4), 376– 383. https://doi.org/10.1037/0003-066X.46.4.376

pandemic only made the gun violence in Chicago worse: 2021 was Chicago's deadliest year for gun violence since 1996.[7]

Research shows that crimes with a gun have more severe mental health impacts than crimes with other weapons.[8] The effects of the particular culture of gun violence within the city of Chicago has created a unique community trauma, the scope of which is finally being studied. A recent survey of young adult African Americans from Chicago's West and South sides showed that 93% of the male respondents who admitted to having carried a gun in the past, responded that they did so to protect themselves, rather than to commit a crime.[9] The overwhelming majority of respondents who admitted to carrying a firearm had also either been victimized themselves or knew someone who had been victimized in the past year.[10] The studies show entire neighborhoods burdened by fear, and a fear that only feeds on itself.

While not an excuse for Mr. Walker's conduct in this case, he effectively grew up in a warzone. As the PSR notes, Mr. Walker has a tattoo of the name "Corey" over his right eyebrow, to memorialize the shooting death of his cousin. (PSR at 84). The PSR

---

[7] AP News "2021 Ends as Chicago's Deadliest Year in a Quarter Century." Jan 1, 2022, Available at: https://apnews.com/article/police-violence-chicago-united-stateshomicide-53931ce4993937b570dd61dbbaa146ce.
[8] Rose M. C. Kagawa et al., *Distress Level and Daily Functioning Problems Attributed to Firearm Victimization: Sociodemographic-Specific Responses*, Annals of Epidemiology, December 6, 2019, avail at https://doi.org/10.1016/j.annepidem.2019.12.002
[9] Jocelyn Fontaine et al., "*We Carry Guns to Stay Safe': Perspectives on Guns and Gun Violence from Young Adults Living in Chicago's West and South Sides*," Urban Institute, October 2018, pg. 4, fig. 3. Available at: https://urbn.is/3oRe0wQ.
[10] *Id.* at Fig. 4 and 5.

process was itself an ordeal that brought out many of the difficulties Mr. Walker previously experienced in school, and he omitted the true number of tattoos he has on his body. He also has the number 30 with a halo over it, in honor of another friend who was shot to death in 2019. Over his left eye, he has the name "Kevin" to honor a cousin who also died from gun violence. On his left arm he has the tattoos "4L," "King Fo," and a face portrait of his friend Makei, all friends who died by gun violence. On his right arm he has the date that his aunt died in a car accident, along with praying hands and the word "forever." Mr. Walker also lost his cousin Antwaun Walker[11] to a shooting, and Antwaun's brother was recently shot and killed in front of their mother.

Mr. Walker has never received any counseling to address the significant losses he has experienced.

It is hard to imagine how someone who has suffered so much loss might risk hurting another in the same way. Research focused on the school-to-prison pipeline that looks specifically at students with learning disabilities found that individuals with learning disabilities often share poor decision making skills and more susceptibility to manipulation from peers.[12] In adolescence, when individuals typically spend more time around their peers than at home with family, they become more sensitive to their influence, more so than adults.[13] In a study designed to determine

---

[11] Antwaun Walker was a defendant before this Court in case number 22 CR 271.
[12] Nancy Cowardin, Ph.D. "*Disorganized Crime: Learning Disability And The Criminal Justice System*" Crim. Just., 13 (2), pp. 11-16.
[13] Bexkens, Anika, et al, "*Peer-Influence on Risk Taking in Male Adolescence with Mild to Borderline Intellectual Disabilities and/or Behavior Disorders.*" Journal of Abnormal Child Psychology, (2019), 47, pp. 543-555, 544.

the effects of peer influence on adolescents with mild to borderline intellectual disability (MBID), researcher found that those individuals with MBID had more risk-taking than their peers, but only under "peer influence."[14] While not an excuse for Mr. Walker's behavior, it provides context to how he could find himself carried along with more violent peers. And without their influence, Mr. Walker is less likely to become a danger in the future.

An appropriate sentence, a just sentence for Mr. Walker is one that reflects the unique reasons for violating the law, and one that addresses the complicated causes of Mr. Walker's illegality. A just sentence in this case, one that promotes respect for the law is one that helps Mr. Walker obtain independence and a sense of safety without carrying a firearm or surrounding himself by other violent influences. That can best be accomplished through a below-guideline sentence that focuses on mental health treatment and access to social services, and not by increased exposure to the people and places who trigger those feelings of danger, and are more likely to influence him towards violence.

### a. The need to provide adequate deterrence and protect the public from future crimes of the defendant.

Clearly deterrence and recidivism are concerns in this case, given Mr. Walker's criminal history and his quick succession of arrests while on bond or probation. Understandably, the sentence in this case must adequately deter Mr. Walker from

---

[14] *Id.* at 551.

committing crimes again in the future. The biggest deterrence in this case, however, is not imprisonment, but treatment and access to services.

With respect to specific deterrence, "the available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."[15] While it may seem evident from Mr. Walker's criminal background that he needs a long sentence to deter him from reoffending, because previous sentences have failed to deter him, the social science evidence shows "[m]ore severe sanctions for those who committed a second crime 'appear to be more criminogenic. For example, among individuals whose first felony led to imprisonment, recidivism was lower when, in response to a second felony, they were sentenced to less severe sanctions . . . regular and intensive probation typically were associated with lower rates of recidivism.'"[16]

The sentence that Mr. Walker has already served while waiting for his sentencing is more than any sentence he has already served. The need to deter Mr. Walker with a longer prison sentence than what he has received in the past has already been accomplished. It is difficult to see how additional years of custody will Mr. Walker any further.

---

[15] Ellen Raaijmakers et al., *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. of Research in Crime and Delinquency 1, 4 (2017).
[16] Daniel Mears & Joshua Cochran, *Progressively Tougher Sanctioning and Recidivism: Assessing the Effects of Different Types of Sanctions*, J. of Research in Crime & Delinquency 24, 33 (2017).

What Mr. Walker needs are prosocial connections and the kinds of life skills that can be encouraged and developed on supervised release. Mr. Walker has a supportive family that he hopes to return to soon. His most constant caregiver, his grandmother, continues to support him fully, and he worries that she may pass away while he is in custody. He hopes to return to his grandparents' home to help care for them, as he did before his arrest in this case. He has suffered the loss of his aunt, only adding to his worry that he will lose his grandmother as well. These relationships that will help Mr. Walker succeed are in danger the longer Mr. Walker remains in custody.

Furthermore, the United States Sentencing Commission's research has found that recidivism decreases as a defendant's education level increases. USSC, *Measuring Recidivism* at 12, Ex. 10 and note 16 Additionally, a number of empirical studies have shown that post-offense educational or vocational training is correlated to a lowered risk of recidivism.[17] Despite the appearance of significant behavioral and developmental problems on paper, Mr. Walker earned his high school diploma. Vocational training help Mr. Walker stay away from negative influences who have

---

[17] *See* Steve Aos, et. al. Washington Institute for Public Policy, *Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates*, 2006 WA. INST. FOR PUB. POL'Y Exs. A.1 & 4. (setting forth a comprehensive review of programs that have demonstrated an ability to reduce recidivism, which includes educational programs both prison- and community-based); *See also* Elizabeth K. Drake, et. al. Washington *Evidence-Based Public Policy Options to Reduce Crime and Criminal Justice Costs: Implications in Washington State*, 2009 WA. INST. FOR PUB. POL'Y tbl. 1. (presenting the findings from the 2006 study, including some revisions since its publication).

guided him in the wrong direction previously, and insulate him from the risks of recidivism.

While the First Step Act has enabled the Bureau of Prisons to better screen for inmates with learning disabilities, there is little information available as to what programs or accommodations are made once an inmate with a learning disability is identified.

> Without accommodations, inmates with learning disabilities such as dyslexia are less likely to participate in prison educational programs or remain in contact with family and friends. Studies suggest that even the most basic educational opportunities and community support while incarcerated can lower prisoner recidivism rates. Inmates who lack accommodations often depend on other inmates to provide services like letter-writing for them. This situation humiliates and frustrates disabled inmates. Dependency on other inmates also puts disabled inmates at a greater risk of being victims of violence, extortion, or being forced to perform favors in return.[18]

Currently, the BOP only has two facilities that offer a residential treatment program for inmates identified as having intellectual disabilities or social deficiencies: at FCI Coleman (Florida), and FCI Danbury (Connecticut).[19] If Mr. Walker qualifies for these programs, he will enter the program at the expense of maintaining connections with his family, who will be unable to travel to these facilities to visit him regularly.

---

[18] Douglas Wilson, Criminal Justice Policy Coalition, *The Silent Victims: Inmates with Learning Disabilities*. Available at: https://www.cjpc.org/the-silent-victims-inmates-with-learning-disabilities.html (last visited May 26, 2022).

[19] *See* Bureau of Prisons, *Directory of National Programs*, available at https://www.bop.gov/inmates/custody_and_care/docs/20170518_BOPNationalProgramCatalog.pdf

With respect to the risk of recidivism for individuals released from custody and on supervised release, social scientists have identified several factors that help insulate recently released individuals from re-arrest or from revocation of their supervised release. These factors include having strong social support, having employment, and feeling motivated to make a change. William Rhodes, *et. al. Recidivism of Offenders on Federal Community Supervision* (Jan, 2013) at 17[20].

Mr. Walker has overwhelming support from his family. Through their support, Mr. Walker received his high school diploma, even with his significant learning disabilities. Although Mr. Walker only had one job before his arrest, and at the time, he was not motivated to continue working there, but now hopes to work with his uncle and obtain his CDL. If Mr. Walker is released, he will receive help from Probation in finding job programs and counseling, which is more suitably provided in the community, rather than in custody. With an actual job and a real paycheck, Mr. Walker will gain a sense of accomplishment over adversity that he has rarely felt in the past.

III.  CONCLUSION

Mr. Walker is now at a crossroads. He must choose if wants to continue a nomadic existence moving from facility to facility with little more than the names of his loved ones imbedded in his skin to comfort him, or decide that he wants to lay down roots and create a life that does not fit in a box small enough to be carried from

---

[20] *Available at:* https://www.ncjrs.gov/pdffiles1/bjs/grants/241018.pdf (last visited June 3, 2025)

place to place. A sentence of 85 months is sufficient to accomplish the goals of sentencing, but more importantly, will allow Mr. Walker to begin the process of setting down his own roots, while his family is still healthy and supportive.

Respectfully Submitted,

s/ Quinn A. Michaelis
Quinn A. Michaelis
Attorney for Joshua Walker
73 W. Monroe, Suite 106
Chicago, IL 60603
312-714-6920

## CERTIFICATE OF SERVICE

I, Quinn A. Michaelis, an attorney, certify that in accordance with Fed. R. Crim. P. 49, Fed R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filings (ECF), the following document:

JOSHUA WALKER'S SENTENCING MEMORANDUM

was served on June 3, 2025, to all parties of record via the CM/ECF system.

s/ Quinn A. Michaelis
Quinn A. Michaelis
Attorney for Joshua Walker
73 W. Monroe, Suite 106
Chicago, IL 60603
312-714-6920